WISCONSIN LUMBER Co., Appellee, v. THE GREENE & WESTERN TELEPHONE Co., Appellant; CITIZENS' NATIONAL BANK, Appellee, v. THE GREENE & WESTERN TELEPHONE Co., Appellant, and THE SECURITY BANK, Appellee, v. THE GREENE & WESTERN TELEPHONE Co., Appellant.

Corporation contracts: ULTRA VIRES. The agreement of a telephone
1  corporation with certain of its stockholders to pay dividends in passes and in case of a sale of its franchise to repurchase their stock, is not *ultra vires* and void as against public policy, where the corporation is not insolvent and no fraud is shown and there is no showing that the corporation agreed to pay more for the stock than it was worth: nor is it material that all of the stockholders were not given the same rights.

Stock subscriptions: ESTOPPEL. A corporation which has had the
2  benefit of a contract with certain subscribers to stock, to the effect that in consideration for the subscriptions the subscribers should receive certain privileges, cannot be heard to deny the authority of its officers to make the contract.

Corporation contract: PRESUMPTION OF AUTHORITY TO EXECUTE.
3  Where an executed contract is such that the officers of a corporation might have been authorized to make it and is under the seal and signature of the corporation, and it is undenied, it will be presumed that its officers had power to execute it.

**Corporate stock:** REPURCHASE. A corporation has power in the absence of charter restrictions, to make a valid contract for the repurchase of its own stock.

**Practice:** DEMURRERS: MOTIONS. A motion to strike an amended answer is not waived by having filed a demurrer to the original answer.

A demurrer to an original pleading may be amended after an amendment to the pleading.

The styling of a pleading a " motion to strike " which is in effect and is treated as an amendment to a demurrer, is not reversible error.

**Tender.** In an action to recover back the amount paid for corporate stock, where plaintiff made a written tender of the stock which was renewed in the petition and the stock was produced on the trial and refused, the tender was sufficient to authorize a judgment, although the written tender was not kept good as required by Code, section 3061; but if insufficient the question cannot be raised on appeal, where the point was not made in the lower court.

*Appeals from Cerro Gordo District Court.*—HON. C. H. KELLY, Judge.

TUESDAY, DECEMBER 13, 1904.

ACTIONS to recover the par value of certain shares of stock in the defendant company, pursuant to a contract whereby the defendant promised and agreed that in the event it sold any of its connections, franchises, or business in the State of Minnesota, it would repurchase of the plaintiffs and pay the par value of any shares of stock in the company owned and held by them. The three actions are based on identical contracts and arrangements, and are the same, except as to parties and the number of shares held by them. The defendant filed answers in each case, to which the plaintiffs separately filed motions to strike and demurrers. The motions were each sustained, and, defendant electing to stand upon its answers, judgment was rendered against it in each case as prayed. Defendant appeals.—*Affirmed.*

*Cliggett, Rule & Keeler* and *J. J. Clark,* for appellant.

*A. A. Adams,* for appellees.

DEEMER, C. J.—The cases were not tried together, nor were they submitted in this court as one, but, as the questions arising are common to each case, they will be disposed of in one opinion.

Each of the plaintiffs purchased and paid for certain shares of stock in the defendant telephone company, upon the express agreement that each should receive for every share of stock one stockholder's pass, good over all the lines and free exchanges of the defendant, as and for a dividend on each share. It was further stipulated that in the event plaintiffs ceased using these passes, or assigned or transferred any of their stock, the plaintiffs or their assignees should thereupon and thereafter be entitled to dividends on their stock, the same as any other shareholder. As a part of the same transaction, it was expressly agreed by the defendant company that in the event it sold, assigned, or transferred any of its connections, franchises, or business in the State of Minnesota, it would, upon demand, repurchase from plaintiffs, at the par value thereof, any of the shares of stock then held by them; and plaintiffs, on their part agreed to accept in payment therefor the par value aforesaid. These contracts were each made in the name of the defendant company, under its corporate seal, by its secretary and president. It is alleged in the petitions that the defendant sold its Minnesota lines, connections, franchises, and business to one Averill, or to the United Telephone & Telegraph Company; and it is also alleged that from and after August 21, 1901, the transferee of this Minnesota business refused to recognize plaintiffs' passes, and denies them the right to use the lines and free exchange connections purchased by it. Plaintiffs thereupon demanded of defendant that it repurchase the stock as agreed, and tendered the same to it. Defendant refused

to repurchase, and thereupon these actions were commenced to recover the agreed par value, with interest, according to the terms of the contracts.

The answers, which are identical, are long, and made up of many divisions and paragraphs. We shall not set them out *in extenso*, but content ourselves with stating the substance thereof, in connection with the claims now made by the defendant regarding the sufficiency thereof.

Aside from a point of practice which we shall hereafter note, defendant's contentions are; (1) that the agreements to repurchase and for free passes were unauthorized by the defendant, and that its officers who made the agreements had no authority to do so; (2) that there was no consideration for the agreements to repurchase; and (3) that as there were a number of other persons who held stock in the defendant company, who had no right to free passes, and no such agreements for repurchase, and who purchased their stock without notice or knowledge of the agreements with plaintiffs, and as these agreements operated to diminish the value of the earnings and the assets of the company, to the prejudice of these other stockholders and the creditors of the company, said promise of free passes and of repurchase were an undue and unjust discrimination in the plaintiff's favor, to the prejudice of other stockholders and the general public, and therefore void as against public policy. The second matter of defense was withdrawn by the defendant, and it elected to rely upon the first and third. After the submission of the demurrers plaintiffs filed amendments to their petitions, to meet the second point made by the defendant, and to this defendant filed a general denial as a part of its answers. Thereupon plaintiffs filed motions to strike the first and third divisions of the answers, because they contained irrelevant and immaterial matter, did not state any defensive or issuable facts, and for the further reason that these divisions each showed completed transactions of which the defendant had had the benefit, and that it was now estopped from re-

pudiating the same. The motions to strike were sustained, but no specific rulings seem to have been made upon the demurrers.

The practice point made by the defendant is that the plaintiffs waived their right to file motions by demurring to the answers, and that a motion to strike is an improper

5. PRACTICE: de- method of testing the sufficiency of matters
murrers: mo-
tions. pleaded in defense. Conceding the correctness of both propositions — and that they are technically correct none will deny — still this court has never been very insistent upon technical accuracy in the use of names given to such pleadings as are here involved. *Chase v. Kaynor,* 78 Iowa, 449; *Seiffert Co. v. Hartwell,* 94 Iowa, 576; *Rhoadabeck v. Blair Co.,* 62 Iowa, 368. As to the alleged waiver by the filing of the demurrers, it appears that, after the demurrers had been submitted, plaintiffs filed amendments to their petitions, and to these defendant filed amendments to its answers. This being true, the right to move was not waived. But even if it were, plaintiffs had the right to amend these demurrers, which is practically what they did in filing what they denominated motions to strike. No objection seems to have been taken at the time to the manner in which the questions were sought to be raised. The motions were treated by all parties as, in effect, amendments to the demurrers, in so far as they related to divisions 1 and 3 of the answer; and while undoubtedly misnamed, this will not constitute reversible error. See authorities hitherto cited.

II. The first divisions of the answers pleaded want of authority in the officers of the corporation to execute the contracts referred to and relied upon in the petitions, and want of power or legal authority to make the same. There is no denial of the execution of the contracts by the president and secretary in the name of the corporation and under its corporate seal, and this must be taken as a conceded fact, but it is claimed that the answers raise an issue as to the authority and power of the agents and of the corporation to make such

contracts.   We take it that the pleader intended to raise two questions thereby:  First, want of authority in fact; and, second, want of legal power in law.

As to the first proposition, it clearly appears, from the implied color which the answers must give in order that the defense may be considered at all, that these officers did in **2. STOCK SUB-SCRIPTIONS: estoppel.** fact make the contracts as alleged in the petition, under the seal of the corporation, and that the defendant corporation has had and enjoyed the benefits of such contracts.   This being true, the corporation cannot accept and ratify the contracts in so far as they were beneficial to it, and repudiate them in so far as they imposed any liability on its part.   It accepted plaintiff's money on the strength of these contracts, and cannot, while retaining the same, be heard to say that its officers had no authority to make the contracts under which it was received.   This is hornbook law, and we need only cite in its support *Field v. Ass'n,* 117 Iowa, 185; *Moore v. M. E. Church,* 117 Iowa, 33; *Melledge v. Boston Iron Co.,* 5 Cush. 158. (51 Am. Dec. 59); *Phila. Co. v. Howard,* 13 How. 307 (14 L. Ed. 157).

The contract being under the seal of the corporation, and the signature of the corporation and its officers being undenied, it will, of course, be presumed not only that the **3. CORPORATION CONTRACTS: presumption of authority to execute.** contract was in fact executed, but that its officers had power to make it.   *Blackshire v. Homestead Co.,* 39 Iowa, 625.   This point as to actual authority or adoption by ratification assumes, of course, that the contracts were such as the officers might have been authorized to perform.

The next proposition, as to legal power or authority, raises incidentally the question of *ultra vires;* that is to say, defendant pleaded want of legal authority in its officers to **4. CORPORATE STOCK: re-purchase.** make the contract in question.   As pleaded in the answer, this is largely a legal conclusion of the pleader, and might well be disregarded upon this ground; but, treating the point as properly raised, we have

this state of facts: There is no showing as to the charter rights of the defendant; that is, there is nothing appearing therein which expressly prohibits the making of such contracts as are here involved. We have to deal, then, with its implied powers. The contracts made between the parties provide for two things: First, the payment of what is in the nature of guarantied dividends; and, second, the repurchase of the stock by the corporation under certain conditions. With the first we now have nothing to do, as plaintiffs are not asking for dividends or their equivalent, nor are they in any manner relying upon that provision of the contracts. In so far as this record shows, they have received all the dividends to which they are entitled. At any rate, they are not asking any here. They seek in these actions to enforce the agreement as to the repurchase of their stock. This agreement is entirely distinct from the agreement to pay dividends. In this connection it is entirely immaterial whether they received any of the promised dividends or not, or as to whether or not that part of the agreement is of any validity. The contracts for dividends and for repurchase of the stock are divisible in so far as the point now under consideration is concerned; that is to say, want of legal power to make the contracts to repurchase the stock. As to that point, it is well settled in this jurisdiction that, in the absence of charter restrictions, a corporation has power to make valid contracts for the repurchase of its own stock. *Iowa Lumber Co. v. Foster,* 49 Iowa, 25; *West v. Averill Grocery Co.,* 109 Iowa, 488; *Rollins v. Shaver Co.,* 80 Iowa, 390. See, also, *Bank v. Bruce,* 17 N. Y. 510; *Commissioners v. Thayer,* 94 U. S. 631 (24 L. Ed. 133). So that, in so far as legal power and authority is concerned, the first division of the answers tenders no defense.

III. The second division of the answers, pleading want of consideration, was withdrawn, and to it we give no further attention.

IV. In the third division the point is made not only

that the officers had no authority, but that the entire scheme was and is *ultra vires,* contrary to public policy, and void.

1. CORPORATION
CONTRACTS:
ultra vires.
It is claimed that the agreement to repurchase the stock at par, and to pay dividends in passes, constituted a fraud upon, and an unjust discrimination in favor of these plaintiffs against the other stockholders, and that such contracts were beyond the power of the corporation.

This defense, as will be noticed, is made by the corporation itself, which has received all of the benefits of the transaction on its part.   The agreement for free passes and to pay dividends is out of the case, save as it may bear on the question of fraud in the transaction, for, as already stated, that part of the contract has, so far as this case is concerned, been fully executed, and is *functus officio.*   But it is contended that the agreement to repurchase, which is as yet executory in character, cannot be enforced, for that, if it be recognized and sustained, it may and will diminish the earnings and assets of the company, to the prejudice of other stockholders and creditors.   This is, in our judgment, the only debatable question in the case.   There is no claim of any actual fraud in the transaction, and no suggestion of any secrecy with reference to the agreement.   Moreover, there is no statement either in pleadings or argument that the stock is not worth what the defendant agreed to repurchase it for. Reliance is placed solely on statements to the effect that the other stockholders had no such privileges or agreements, and that said agreements to repurchase diminished the value of the earnings and the assets of the company, to the prejudice of other stockholders and creditors.   It goes without saying that the enforcement of these contracts will take the amount paid for the repurchase of the stock out of the earnings and assets of the company.   But this is true in every case where a corporation is permitted to repurchase its own stock.   However, its stockholders' liability is reduced by that amount, and, in the absence of fraud or a plea of insolvency on the part of the corporation, we do not see how

either the stockholders or creditors are prejudiced, unless it appears that the corporation agreed to pay more for the stock than it was worth. No claim of this kind is made in the defendant's answer, save by way of a general statement of a legal conclusion that the earnings and assets will be diminished to the prejudice of defendant's stockholders and creditors. No facts are pleaded, however, which will justify any such inference. No actual fraud or secrecy is pleaded, but it is argued that such a transaction is contrary to public policy.

The cases differ in many respects from most of those cited by counsel for the defendant company. In most of them the subscriber for stock was endeavoring to escape liability on his contract by reason of a contract or an understanding that he was not to be liable thereon, or that his liability was contingent or for only a part of the amount of the subscription price. This case involves no such question. Here the defendant corporation is endeavoring to escape liability on a contract for repurchase, of which it had the full benefit, because of some actual or implied fraud, or because the contract is void as being against public policy. We fail to see that any question of public policy is involved. A corporation may guaranty dividends upon its stock if it is so minded. To hold otherwise would be to set aside many contracts of the kind, which no one heretofore has thought of questioning. The free use of its lines was given as and for dividends, and the plaintiffs had the right at any time to renounce that part of the agreement and to accept regular dividends. It is not contrary to public policy for a corporation to repurchase its own stock. This has many times been held, not only by this court, but in other jurisdictions as well. Of course, fraud will defeat any contract; but no actual fraud is pleaded, nor is there any attempt to plead facts from which fraud might be inferred. At best, there is a mere suggestion or inference of fraud, but no sufficient facts are pleaded from which such inference may legitimately

be drawn.   There is, as we have said, no showing that the
corporation is insolvent, and no attempt to plead or show that
the stock is not worth what defendant agreed to give for it.
True, other stockholders were not given the rights accorded
to these plaintiffs, but this in itself is no reason for not en-
forcing the contracts against the corporation itself, for there
is no showing of any prejudice to other stockholders.   It
may be that their stock is worth more than par.   As to this,
we are not advised.   But in the absence of direct averment,
we cannot presume anything in defendant's favor in order
to defeat these contracts, that it may escape from what ap-
pear on their face to be valid obligations.   Having received
the benefits of these contracts, it does not lie in defendant's
mouth to plead the invalidity thereof because *ultra vires.*
*Field v. Ass'n, supra.*   See, also, *Fremont Co. v. Thomsen,*
65 Neb. 370 (91 N. W. Rep. 378); *Watts v. Ass'n,* 111
Iowa, 90.

The defendant is not a mutual company; it is purely
a stock concern; and we know of no reason of public policy
or of sound morals which inhibits it from making such con-
tracts as are here sought to be enforced, in the absence of
some showing of fraud or *mala fides.*   The public has no in-
terest in such matters.   Perhaps a case might be made where
other stockholders or creditors could intervene, or in which
creditors could enforce some liability against the plaintiffs,
or object to the enforcement of the contracts, but no such
questions are presented by this record.   Plaintiffs paid full
value for their stock when they purchased it, and were in-
duced to purchase through the promises and agreements of
the defendant, its officers and agents.   To now allow the de-
fendant to repudiate its agreements would be offering a
premium upon wrongdoing.   The plea of *ultra vires* is not
looked upon with favor, and, when a corporation has received
the benefits growing out of a contract, such contract will
be enforced against it, unless it be entered into through
fraud, or there be persuasive considerations of public policy

involved. Neither of these appears in the defendant's answer. As fully sustaining our conclusions on this point, see *Field v. Ass'n, supra; Wright v. Pipe Line Co.,* 101 Pa. 204 ( 47 Am. Rep. 701) ; *Chester Co. v. Dewey,* 16 Mass. 94 (8 Am. Dec. 128) ; *Manchester R. Co. v. R. R.,* 66 N. H. 100 (20 Atl. Rep. 383, 9 L. R. A. 689, 49 Am. St. Rep. 582) ; *Nat. Bank v. Matthews,* 98 U. S. 621 (25 L. Ed. 188).

In order to recover in this case, plaintiffs are not required to rely upon an illegal contract. The agreement to repurchase the stock was neither *ultra vires,* illegal, nor immoral. There was no actual fraud, and no facts are stated from which fraud may legitimately be inferred. Stockholders may, in equity, sometimes set aside *ultra vires.* acts done by a corporation, which the corporation itself may not take advantage of. *R. R. Co. v. Ellerman,* 105 U. S. 166 (26 L. Ed. 1015) ; 4 Thompson on Corporations, section 4483 *et seq.* But in such cases it must be shown that the conduct of the officers or directors works a substantial injury. However, speculation on this point is unnecessary, for the questions are not here at issue. We reach the conclusion that the third division of the answer presents no defense.

V. Lastly, it is argued that the court erred in rendering judgments against the defendant for the reason that the plaintiffs did not tender and bring their shares of stock into court at the time the judgments were rendered.

6. TENDER.    This point does not seem to have been made in the lower court, and, of course, cannot be taken advantage of here. But we find that plaintiffs did make a written tender; that they, in their petitions, renewed these tenders, but that defendant refused to receive back the stock; and that on the trial plaintiffs produced the shares of stock in court, and filed them with the clerk. These facts are sufficient to justify the judgment, although the first written tender was not kept good as required by statute (Code, section 3061). *Williams v. Triplett,* 3 Iowa, 518.

There is no prejudicial error in the record, and the judgments are each and all *affirmed.*